UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04 11576 WGY

MAGISTRATE JUDGE _____

JAMES N. ALVAREZ, on behalf of himself
and as Sellers Representative on behalf of
former shareholders of the Marketing
Information & Technology Trust and the
Direct Mail Credit Data Trust,

    Plaintiff,

v.

CHOICEPOINT SERVICES, INC.,

    Defendant.

CIVIL ACTION NO.

RECEIPT # _____
AMOUNT $150
SUMMONS ISSUED ___
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. ___
DATE 7/14/04

## PETITION FOR ORDER COMPELLING ARBITRATION PURSUANT TO 9 U.S.C. §4 AND COMPLAINT FOR DECLARATORY RELIEF

For his complaint against Defendant in this action, Plaintiff James Alvarez, on behalf of himself and as Sellers Representative on behalf of former shareholders of the Marketing Information & Technology Trust and the Direct Mail Credit Data Trust, states and alleges as follows:

### Summary of Claim

1. This is an action brought pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, and the Federal Declaratory Judgment Act, 28 U.S.C. §2201. Plaintiff (a) seeks a declaration that the parties agreed in a Share Purchase Agreement dated June 7, 2001 ("Agreement") to arbitrate the current dispute between the parties concerning, *inter alia*, the interpretation of the Agreement's so-called Earnout provision; and (b) petitions for an order directing that arbitration proceed in the manner set forth in the Agreement. The Agreement

BOS1398325.3

provided that Defendant would pay an additional purchase price (defined in the Agreement as the "Earnout Amount") based on the revenue and profit performance of the companies purchased by Defendant during the Earnout Period, as defined in the Agreement. Mr. Alvarez contends that Defendant engaged in a pattern of conduct subsequent to the closing designed to minimize or avoid altogether payment of an Earnout. Moreover, the parties dispute the components to be included in the calculation of Earnout revenue and profit, due to alleged ambiguities in the Agreement. The Agreement requires that the parties arbitrate their dispute concerning Defendant's post-closing conduct and the interpretation of the Earnout provision. Despite such requirement, Defendant contends that the dispute should be submitted to an accounting firm which the parties agreed would only confirm the accuracy of the Earnout calculation. The parties did <u>not</u> agree that an accountant would resolve a dispute concerning the interpretation of the Earnout provision, the proper components to be included in the Earnout calculation in the first instance, or the propriety of the Defendant's post-closing conduct. Accordingly, pursuant to the Agreement, Plaintiff has contemporaneously filed a Demand for Arbitration with JAMS/Endispute, a true and accurate copy of which Demand is attached hereto as <u>Exhibit A</u>. Defendant should be compelled to arbitrate in the manner to which the parties agreed.

**Parties**

2.    Plaintiff James N. Alvarez ("Alvarez") is an individual residing in Boxford, Massachusetts. Alvarez is the former President of Marketing Information and Technology, Inc. ("MITI"), a Massachusetts corporation, and the former President of Direct Mail Credit Data, Inc. ("DMCD"), a Massachusetts corporation.

3. Defendant ChoicePoint Services Inc. ("ChoicePoint" or "Defendant") is a corporation organized under the laws of the State of Georgia with its corporate headquarters and principal place of business in Alpharetta, GA.

## Jurisdiction and Venue

4. This Court has personal jurisdiction over ChoicePoint because ChoicePoint is registered as a foreign corporation doing business in Massachusetts, it conducts substantial operations in Massachusetts (including without limitation through its wholly-owned subsidiary ChoicePoint Precision Marketing (formerly known as MITI) located in Andover, MA) and the facts and circumstances giving rise to this dispute occurred in substantial part in Massachusetts.

5. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and is between citizens of different states. Alvarez is a citizen of Massachusetts. ChoicePoint is a citizen of Georgia.

## Allegations Applicable To All Counts

### The Earnout Provision in the Agreement

6. Pursuant to the Agreement, ChoicePoint purchased all of the issued and outstanding shares of the Marketing Information & Technology Trust (the "MITI Trust") and the Direct Mail Credit Data Trust (the "DMCD Trust"), from, among others, Alvarez. The MITI Trust and the DMCD Trust owned all the capital stock in MITI and DMCD, respectively. MITI and DMCD, collectively, will be referred to hereinafter as the "Corporations". A true and accurate copy of the Agreement is attached to the Arbitrant Demand (Ex. A hereto).

7. Mr. Alvarez is the Seller's Representative, as that term is defined in the Agreement, and is authorized to take action to protect the interests of the former shareholders of the MITI Trust and the DMCD Trust (including himself) relating to the Earnout.

8. At the time of the Agreement, MITI was engaged in the business of providing database marketing services, including database management services, database development, list compilation and processing and marketing.

9. At the time of the Agreement, DMCD was engaged in the business of storing Consumer Report information and prescreening services.

10. ChoicePoint is engaged in the business of providing consumer information to insurance companies, credit card companies and mortgage companies, among others.

11. ChoicePoint purchased the shares of the MITI Trust and the DMCD Trust for $52,000,000. Section 1.3 of the Agreement, however, also required ChoicePoint to pay an additional purchase price, called the "Earnout", if the revenue and/or profit performance of the Corporations achieved certain goals during the thirteen to twenty-four (13-24) month period following the closing (the "Earnout Period").

12. The closing under the Agreement occurred on or about June 30, 2001. The Earnout Period was July 1, 2002 through June 30, 2003.

13. The Earnout provision of the Agreement, Section 1.3, set forth (i) the revenue and profit goals that trigger an Earnout payment; (ii) the items to be included in the calculation of Earnout revenue and profit; (iii) the manner in which the business of the Corporations would be operated during the Earnout Period; and (iv) the Earnout calculation itself.

14. Under the Agreement, an Earnout is to be paid if the Corporations' "Revenue" and "OPBA" achieved certain goals during the Earnout Period. OPBA is defined as the "combined operating profits of [the Corporations] determined by subtracting the operating expenses . . . from Revenues." §1.3(a).

15. For purposes of the Earnout provision, "Revenue" is defined as "gross revenues from the operations of [the Corporations] consistent with current accounting practices of [the Corporations] in accordance with GAAP . . .".

16. The Earnout clause further requires that certain revenue derived from the operations of ChoicePoint be added to "Revenue." Under the Agreement, Revenue shall include 100% of the revenue generated from the sale by ChoicePoint and its affiliates of certain data, known as "Experian Credit Variables" data, "fulfilled by or through MITI".

17. Similarly, 40% of revenue generated from the sale of "Attract", "Attract with Claims" and "Expiration Date" data to certain customers are to be added to Revenue.

18. In addition, the Earnout provision requires that 30% of revenue generated from certain activities of ChoicePoint and its affiliates for certain specified customers (including without limitation Nationwide) be added to Revenue and that the same percentage of revenue for certain sales to other specifically identified customers be deducted from Revenues.

<u>ChoicePoint's Conduct Subsequent to the Closing was Designed to Minimize, if not Avoid, an Earnout</u>

19. The Agreement required ChoicePoint to take certain steps subsequent to the closing to enhance the likelihood of an Earnout payment and to maximize the amount of any such Earnout. For example, the Agreement required that ChoicePoint "use its good faith commercially reasonable efforts to transition the fulfillment of all data sales, including 'Attract,' 'Attract with Claims,' 'Expiration Dates' and 'Experian Credit Variables,' to [MITI] as promptly as reasonably practicable . . ." <u>See</u> section 1.3(i).

20. In addition, the Agreement prohibited ChoicePoint, without the consent of Mr. Alvarez as Seller's Representative, from "causing the Corporations to take any actions that

would reasonably be expected to materially adversely affect the Earnout Amount." See Section 1.3(h)(vi).

21. The Earnout provision also required ChoicePoint to integrate into MITI's operations any competitive business acquired by ChoicePoint subsequent to the closing and to adjust the Earnout accordingly. See §1.3(i).

Choice Point's Conduct Subsequent to the Closing was Designed to Minimize, if not Avoid, an Earnout

22. Subsequent to the closing, ChoicePoint engaged in a pattern of conduct designed to avoid or minimize payment of an Earnout to the Corporations' shareholders. Such conduct included, without limitation, the following:

- ChoicePoint acquired a competing business subsequent to closing, known as the Experian Insurance Group or Experian Insurance Vertical, but did not integrate such business into MITI. See §1.3(i) ChoicePoint intentionally decided not to integrate this competing business because it would have substantially increased Earnout Revenue and OPBA;

- ChoicePoint caused MITI to perform substantial work on data sales (of the type required to be included in Earnout Revenue) that were shipped to other divisions or groups within ChoicePoint and its affiliates prior to final sale to customers. ChoicePoint engaged in such conduct because it asserts (wrongly) that the completion of such sales by ChoicePoint affiliates other than MITI brought sales outside the scope of the "fulfilled by or through [MITI]" condition under §1.3(a);

- ChoicePoint caused the Corporations to incur substantial expense on internal jobs but did not give the corresponding Revenue credit to the Corporations;

- Despite its obligation under §1.3(h)(vii) to "use its good faith commercially reasonable efforts to transition the fulfillment of all data sales, including 'Attract,' 'Attract with Claims,' 'Expiration Dates' and 'Experian Credit Variables,' to [MITI] as promptly as reasonably practicable," ChoicePoint intentionally bypassed MITI and transitioned the sales of such data to its Peoria, IL facility. ChoicePont engaged in such conduct because it believes (wrongly) that such sales are outside the scope of the "fulfilled by or through [MITI]" condition under §1.3(a);

- Based, in substantial part, on Mr. Alavarez's objections to ChoicePoint's operations of the Corporations, ChoicePoint terminated Mr. Alvarez's employment as Chief Operating Officer of the Corporations prior to the Earnout Period. Terminating Mr. Alvarez's employment facilitated ChoicePoint's operation of the Corporations in a manner that adversely affected the Earnout;

- In furtherance of its scheme to reduce or avoid an Earnout, ChoicePoint refused to provide Mr. Alvarez with critical financial information relating to the operations of ChoicePoint and the Corporations subsequent to the Earnout Period, undermining Mr. Alvarez's ability to determine the propriety of ChoicePoint's conduct as it pertained to Earnout Revenue and OPBA; and

- After a dispute arose concerning the Earnout, ChoicePoint refused to submit such dispute to arbitration, as required by section 1.3(l) of the Agreement, further delaying payment of any Earnout and causing Mr. Alvarez to incur substantial additional attorneys' fees and costs.

23. Pursuant to the Agreement, ChoicePoint has disclosed three Earnout calculations to date. Plaintiff disputes ChoicePoint's' calculations for several reasons, including but not limited to:

- ChoicePoint has failed to include all sales of Experian Credit Variables data made by ChoicePoint and its affiliates fulfilled by or through MITI, as required by §1.3(a).

- ChoicePoint has failed to include as Revenue sales of data by a competing business acquired by ChoicePoint subsequent to closing, known as the Experian Insurance Group or Experian Insurance Vertical. Such revenue must be included both because (a) such sales include the sale of Experian Credit Variables data; and (b) under §1.3(h)(viii) ChoicePoint was required to integrate the Experian Insurance Group into MITI and to adjust the Earnout revenue accordingly, which ChoicePoint intentionally failed to do in order minimize, if not avoid entirely, an Earnout.

- ChoicePoint has failed to include as Revenue an appropriate amount for sales of data on projects performed at MITI, shipped to other divisions or groups within ChoicePoint and its affiliates, for ultimate sale to customers. Such internal data jobs must be included in Revenue because such sales were "fulfilled by or through [MITI]" under §1.3(a).

- ChoicePoint charged the Corporations with substantial expenses on for work performed by the Corporations on internal jobs without giving the Corporations the corresponding Revenue credit.

- The Earnout Revenue disclosed by ChoicePoint did not account for sales of 'Attract,' 'Attract with Claims,' 'Expiration Dates' and 'Experian Credit Variables' data by ChoicePoint affiliates.

- ChoicePoint failed to add to Revenue 30% of revenue generated from "Field Assist and Print Production activities of [ChoicePoint] . . . for . . . Nationwide . . .", as required by §1.3(a).

22. ChoicePoint disputes each of the foregoing assertions of the Plaintiff.

The Arbitration Provision

23. Section 1.3(l) of the Agreement provides, in part:

> Dispute Resolution. The parties acknowledge that *in connection with the conduct of the operations of the Corporations as that may affect the Earnout, and in calculating the Earnout Amount,* disputes may arise between the parties. The parties shall first cooperate and use their mutual good faith efforts to resolve any such disputes between themselves without the assistance of others. The parties may voluntarily submit such disputes to mediation before a jointly selected single mediator who shall have forty-five (45) days to mediate and assist the parties to settle the dispute between themselves. . . *If the parties choose not to mediate, or such mediation is not successful, then the dispute will be settled exclusively by binding arbitration administered by Jams/Endispute in New York City.* Such arbitration shall be brought before a sole neutral arbitrator, who shall be (i) if possible, mutually selected by the parties, (ii) if possible, familiar with acquisition agreements, earnout matters and related financial accounting, (iii) a licensed member of the Bar of New York, and, (iv) if possible, a retired judge. . . . Judgment may be entered on the arbitrator's award in any court having jurisdiction. (Emphasis in italics supplied).

24. The parties elected not to mediate the dispute between the parties.

25. ChoicePoint has refused to arbitrate the dispute on the basis that the Agreement contains a provision under which the accuracy of the Earnout calculation would be confirmed by an independent accounting firm, Arthur Anderson LLP. See Section 1.3(f).

26. Section 1.3(f)'s accountant confirmation provision is inapplicable to the dispute at bar because the parties dispute the "conduct of the operations of the Corporations as that may affect the Earnout" and that a dispute has arisen "in calculating the Earnout Amount." Section

1.3(1). The parties plainly agreed to arbitrate the dispute at bar. This dispute, concerning the proper components to be included in the Earnout calculation and whether ChoicePoint's post-closing conduct violated the Earnout provision, must first be resolved by arbitration. The decision of the arbitrator will trigger the calculation of the proper Earnout Amount, which only then can be confirmed by an accountant.

27.   The parties do not dispute that one or more of the revenue and profit goals were achieved during the Earnout Period. ChoicePoint acknowledges that the Seller (as that term is defined in the Agreement) is due an Earnout payment. ChoicePoint has refused to pay any Earnout notwithstanding the Earnout Amount, according to its own calculations, is at least $1,600,000.

28.   On information and belief, Mr. Alvarez believes that an Earnout of approximately $7,000,000-$9,000,000 is due and owing from the Defendant.

## COUNT I
### (Declaratory Judgment)

29.   Plaintiff hereby incorporates by reference the allegations stated in all the preceding paragraphs of this Complaint as if fully stated herein.

30.   There exists an actual controversy between the parties concerning whether the parties agreed to arbitrate the dispute between them relating to the Earnout provision.

31.   Declaratory relief will resolve the controversy between the parties concerning whether such dispute is arbitrable.

## COUNT II
### (Petition for Order Compelling Defendant to Submit to Arbitration)

32.   Plaintiff hereby incorporates by reference the allegations stated in all the preceding paragraphs of this Complaint as if fully stated herein.

33.  The Agreement, and its provisions for arbitration of disputes, are subject to and governed by the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 *et. seq.* (the "Act"), because the Agreement involves interstate commerce, within the meaning of Section 2 of the Act.

34.  Section 4 of the Act provides, in part:

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 . . . for an order directing that such arbitration proceed in the manner provided for in such agreement.

35.  The Agreement, specifically Section 1.3(l) thereof, is a "written agreement for arbitration" under Section 4 of the Federal Arbitration Act.

36.  Plaintiff has filed a Demand for Arbitration ("Arbitration") with JAMS/Endispute in New York City, as required by the Agreement. See Exhibit A.

37.  The nature of the dispute, as described herein and in the Arbitration filed by Plaintiff (Exhibit A hereto), falls squarely within the arbitration provision contained in Section 1.3(l) of the Agreement.

38.  Defendant refuses to arbitrate the dispute between the parties pursuant to the Agreement.

39.  Accordingly, pursuant to Section 4 of the Act, Plaintiff is entitled to an order directing that the Arbitration proceed in the manner provided for in the Agreement.

## DEMAND FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. That the Court, pursuant to Section 4 of the Federal Arbitration Act, direct that the Arbitration filed by Plaintiff with JAMS/Endispute in New York City proceed in the manner set forth in Section 1.3(l) of the Agreement, and order Defendant to submit to such Arbitration;

B. That the Court conduct a hearing on Plaintiff's petition under Section 4 of the Federal Arbitration Act within five days of notice to the Defendant of such petition;

C. That the Court, pursuant to 28 U.S.C. §2201, enter judgment declaring that any dispute between the parties, as described in Plaintiff's complaint and Exhibit A hereto, be submitted to binding arbitration in a manner set forth in Section 1.3(l) of the Agreement; and

D. That the Court grant Plaintiff his costs, interest, attorneys' fees and such other and further relief as the Court deems just and appropriate.

JAMES N. ALVAREZ, on behalf of himself and as Sellers Representative on behalf of former shareholders of the Marketing Information & Technology Trust and the Direct Mail Credit Data Trust,

By his counsel,

_____
Deborah L. Thaxter (BBO# 495520)
David B. Mack (BBO# 631108)
NIXON PEABODY, LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000
Fax: (617) 345-1300

Dated: July 14, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) **James N. Alvarez v. ChoicePoint Services, Inc.**

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   - [ ] I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.
   - [x] II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   *Also complete AO 120 or AO 121 for patent, trademark or copyright cases
   - [ ] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.
   - [ ] IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.
   - [ ] V.   150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES [ ]   NO [x]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES [ ]   NO [x]
   
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES [ ]   NO [x]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES [ ]   NO [x]

7. Do **all** of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES [x]   NO [ ]

   A. If yes, in which division do **all** of the non-governmental parties reside?
      Eastern Division [x]   Central Division [ ]   Western Division [ ]

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division [ ]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES [ ]   NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Deborah L. Thaxter and David B. Mack
ADDRESS   Nixon Peabody, LLP, 100 Summer Street, Boston, MA 02110
TELEPHONE NO.   617-345-6141

(Coversheetlocal.wpd - 10/17/02)

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
James N. Alvarez

(b) County of Residence of First Listed Plaintiff  Essex
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Deborah L. Thaxter and David Mack
Nixon Peabody, LLP, 100 Summer Street
Boston, MA 02110

## DEFENDANTS
ChoicePoint Services, Inc.

County of Residence of First Listed  Fulton
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

Ralph B. Levy
King & Spaulding, 191 Peachtree Street
Atlanta, GA 30303

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury—Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury—Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations / Habeas Corpus: | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | / ☐ 540 Mandamus & Other / ☐ 550 Civil Rights / ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

This is a petition for an order compelling arbitration pursuant to 9 U.S.C. § 4 and complaint for declaratory relief.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ None

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE

DOCKET NUMBER

DATE: July 14, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUN_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____