UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES N. ALVAREZ, on behalf of himself and as Sellers Representative on behalf of former shareholders of the Marketing Information & Technology Trust and the Direct Mail Credit Data Trust, )<br><br>Plaintiff, )<br><br>v. )<br><br>CHOICEPOINT SERVICES INC., )<br><br>Defendant. ) | CIVIL ACTION NO.<br>04 11576 WGY |

## ANSWER TO PETITION FOR ORDER COMPELLING ARBITRATION PURSUANT TO 9 U.S.C. § 4 AND COMPLAINT FOR DECLARATORY RELIEF

Defendant ChoicePoint Services Inc. ("Defendant") answers Plaintiff James N. Alvarez's ("Plaintiff") Petition for Order Compelling Arbitration Pursuant to 9 U.S.C. § 4 and Complaint for Declaratory Relief (collectively the "Petition"), as follows:

### First Defense

The Petition fails to state a claim upon which relief can be granted, or this judicial district is an improper venue for Plaintiff's Petition, because this Court lacks the requisite power to order arbitration to proceed outside this judicial district and the Petition shows on its face that Plaintiff seeks to compel arbitration in New York City, New York. Moreover, Plaintiff has already filed a demand for arbitration (the "Arbitration Demand") with JAMS/Endispute to which Defendant must respond. A motion to dismiss on these grounds is filed contemporaneously herewith.

<u>Second Defense</u>

Defendant answers the numbered paragraphs of the Petition as follows, and hereby denies each and every averment thereof that is not admitted, denied, or otherwise controverted below:

1.      Answering paragraph 1, Defendant admits that the action is brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201; admits that the Plaintiff seeks a determination that the parties agreed in a Share Purchase Agreement dated June 7, 2001 ("Agreement") to arbitrate a dispute concerning the proper calculation of the earnout referenced in the Agreement and an order directing that such an arbitration proceed; admits that Plaintiff has filed a Demand for Arbitration with JAMS/Endispute, a true copy of which is attached to the Petition as Exhibit A thereto; admits that Plaintiff and Defendant disagree as to the proper calculation of the earnout under the Agreement; admits that the Agreement requires construction in respect of the interplay between sections 1.3(f) and 1.3(l) thereof and the determination of which section is controlling as to post-earnout period disputes regarding the proper calculation of the earnout; and admits that Defendant has taken the position that, if the parties are unable to agree on a consensual basis for mediation and JAMS/Endispute arbitration, section 1.3(f) of the Agreement is controlling; but Defendant denies the remaining allegations of said paragraph.

2.      Paragraph 2 is admitted.

3.      Paragraph 3 is admitted.

4.      Paragraph 4 is admitted.

5.    Answering paragraph 5, Defendant admits that there is diversity of citizenship between Plaintiff and Defendant and that the amount in controversy may exceed $75,000. For further answer, Defendant incorporates by reference its Motion to Dismiss filed contemporaneously herewith.

6.    Paragraph 6 is admitted.

7.    Paragraph 7 is admitted.

8.    Paragraph 8 is admitted.

9.    Paragraph 9 is admitted.

10.    Paragraph 10 is admitted.

11.    Answering paragraph 11, Defendant admits that it purchased the alleged shares for the amount alleged; states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof; and denies the remaining allegations of the paragraph to the extent inconsistent therewith.

12.    Paragraph 12 is admitted.

13.    Answering paragraph 13, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

14.    Answering paragraph 14, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

15.    Answering paragraph 15, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

16.    Answering paragraph 16, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

17.    Answering paragraph 17, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

18.    Answering paragraph 18, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

19.    Answering paragraph 19, Defendant states that the Agreement, including Section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.  Answering further, Defendant shows that it has complied in all respects with the Agreement.

20.    Answering paragraph 20, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.  Answering further, Defendant shows that it has complied in all respects with the Agreement.

21.    Answering paragraph 21, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.  Answering further, Defendant shows that it complied in all respects with the Agreement.

22.    Paragraph 22 is denied.

23.    Paragraph 23 is denied.

24 [erroneously numbered "22"].[1]  Paragraph 24 is admitted.

25.    Answering paragraph 25, Defendant states that the Agreement, including section 1.3 thereof, speaks for itself as to the terms thereof and denies the allegations of the paragraph to the extent inconsistent therewith.

26.    Paragraph 26 is denied.

27.    Paragraph 27 is denied.

28.    Paragraph 28 is denied.

29.    Paragraph 29 is denied.

30.    Defendant lacks information or knowledge sufficient to form as belief as to the truth of the allegations of paragraph 30.

31.    Defendant incorporates by reference its responses to the preceding paragraphs of the Petition.

32.    Answering paragraph 32, Defendant denies that there is an "actual controversy concerning whether the parties agreed to arbitrate the dispute between them relating to the Earnout provision." For further response, Defendant states that it has never taken the position that the parties' Earnout dispute would not be subject to arbitration if it is were not successfully mediated. For even further response, Defendant incorporates by reference its Third Defense.

33.    Answering paragraph 33, Defendant denies that there is an actual controversy over whether the parties' Earnout dispute is arbitrable and denies that declaratory relief is appropriate or necessary. For further response, Defendant incorporates by reference its Third Defense.

---

[1] The numbered paragraphs of this Second Defense starting with paragraph 24 are two digits higher than the erroneously numbered paragraphs of Plaintiff's complaint to which they relate.

34.     Defendant incorporates by reference its responses to the preceding paragraphs of the Petition.

35.     Answering paragraph 35, Defendant admits that the parties' Earnout dispute is subject to the Federal Arbitration Act although, for further answer, Defendant incorporates by reference its Third Defense and reserves its right to argue that any such arbitration ought to proceed under the arbitration provisions of Section 1.3(f) of the Agreement.

36.     Paragraph 36 is admitted.

37.     Paragraph 37 is admitted.  For further answer, Defendant states that the Agreement, specifically Section 1.3(f) thereof, is also a "written agreement for arbitration" under Section 4 of the Federal Arbitration Act.

38.     Paragraph 38 is admitted.

39.     Paragraph 39 is denied.

40.     Answering paragraph 40, Defendant denies that it has refused to arbitrate an arbitrable dispute.  For further answer, Defendant incorporates by reference its Eighth Defense.

41.     Paragraph 41 is denied.

<u>Third Defense</u>

The parties have always agreed that the earnout dispute would have to be resolved by arbitration if not consensually resolved.  The parties have disagreed, however, on whether such arbitration was to proceed under Section 1.3(f) or Section 1.3(l) of the Agreement.  Having filed the Arbitration Demand, plaintiff has already submitted this dispute to JAMS/Endispute and – under Rule 11(c) of the JAMS/Endispute

Comprehensive Arbitration Rules – JAMS/Endispute must decide whether Section 1.3(f) or Section 1.3(l) is controlling.

### Fourth Defense

By failing to deliver a Second Objection Notice under the Agreement, Plaintiff has waived the right, and/or become estopped, to contest Defendant's earnout calculation.

### Fifth Defense

Plaintiff's Demand for Arbitration includes claims for contract breach and unfair and deceptive conduct for which there is no agreement to arbitrate.

### Sixth Defense

Section 8.3 of the parties' Agreement contains a State of Georgia choice of law that governs not only the interpretation of the Agreement but also "the performance of the obligations imposed by this Agreement." Plaintiff's Demand for Arbitration improperly includes a claim for unfair and deceptive conduct under Mass. Gen. L. ch. 93A, § 11 which is preempted by the parties' choice of law.

### Seventh Defense

Plaintiff's Petition is premature and is not ripe in that Defendant has not had an opportunity to respond to the Demand for Arbitration.

### Eighth Defense

This action was precipitously filed without good cause. Negotiations were ongoing between the parties toward consensual mediation and follow-on arbitration before JAMS/Endispute if mediation failed. The parties had even agreed in principle on the identity of the mediator and the JAMS/Endispute arbitrator. Attached hereto as

Exhibits A and B, respectively, are Plaintiff's memorandum dated May 27, 2004 and
Defendant's response dated July 2, 2004, which evidence the latest communications
between the parties immediately prior to the commencement of this action twelve days
later. Without *any* post-July 2 word to Defendant, not even a telephone call, Plaintiff
filed this action seeking, among other things, *costs and attorney's fees* and alleging that
the *parties agreed to forego mediation.* While it is true that Defendant had reserved (and
still reserves) the right to contend that section 1.3(f) of the Agreement is controlling if the
parties could not reach a basis for consensual mediation/arbitration, Plaintiff has failed to
inform the Court that the parties *were* working in good faith toward an arrangement that
would have resulted in a JAMS/Endispute arbitration (had the mediation been
unsuccessful) and that would have rendered the interplay between sections 1.3(f) and
1.3(l) of the Agreement academic. Whether, and why, there is a constitutionally-
required ripe dispute between the parties is unknown to Defendant. If there is not, this
case should be dismissed. In any event, under all of the circumstances, including the
foregoing and the First Defense herein, the Court should *not* countenance the Plaintiff's
prayer for costs to be cast against Defendant but Defendant's costs should be cast against
the Plaintiff.

WHEREFORE, having answered the Petition, Defendant prays that this action be
dismissed and that the costs thereof be cast against the Plaintiff.

Mary Winstanley O'Connor (BBO# 541708)
Gaffin Krattenmaker & O'Connor P.C.
2400 Prudential Tower, 800 Boylston Street
Boston, Massachusetts 02199-8001
(617) 437-6530

(617) 437-9419 (fax)

Attorneys for Defendant ChoicePoint Services Inc.

Of Counsel:

Ralph B. Levy
James N. Gorsline
King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303-1763
(404) 572-4600

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES N. ALVAREZ, on behalf of himself and as Sellers Representative on behalf of former shareholders of the Marketing Information & Technology Trust and the Direct Mail Credit Data Trust,<br><br>　　　Plaintiff,<br><br>v.<br><br>CHOICEPOINT SERVICES INC.,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.<br>)　04 11576 WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing pleading on counsel for plaintiff

by causing a true and correct copy of the same to be deposited in the United States Mail,

postage prepaid, addressed as follows:

> Deborah L. Thaxter
> David B. Mack
> Nixon Peabody, LLP
> 100 Summer Street
> Boston, MA 02110

This **22nd** day of July, 2004.

Mary Winstanley O'Connor (BBO# 541708)
Gaffin Krattenmaker & O'Connor P.C.
2400 Prudential Tower, 800 Boylston Street
Boston, Massachusetts 02199-8001
Attorneys for Defendant ChoicePoint Services Inc.



# NIXON PEABODY LLP
ATTORNEYS AT LAW

100 Summer Street
Boston, Massachusetts 02110-2131
(617) 345-1000
FAX: (617) 345-1300

### MEMORANDUM

TO:        Ralph B. Levy

CC:        James N. Alvarez
           J. Michael de Janes

FROM:      David R. Gluck and Deborah L. Thaxter

DATE:      May 27, 2004

---

The purpose of this memorandum is to respond to your proposal dated April 12, 2004 concerning mediation and arbitration issues. No rights of Mr. Alvarez under the Share Purchase Agreement are hereby waived, and Mr. Alvarez's claims shall not be limited to those issues set forth below in the event we cannot reach timely agreement regarding your proposal.

Mediation.

Mr. Geronemus as mediator, New York City for venue, the timing, duration and cost sharing of the mediation are all acceptable as described in your proposal. The list of issues subject to mediation and the stipulation of other facts concerning the calculation of the Earnout amount are discussed below.

Mr. Alvarez will be present for the mediation with Mr. Gluck and Ms. Thaxter. Given his extensive discussions with Mr. Alvarez, we think it would make sense to have Doug Curling available to reach any settlement decisions that may be possible.

Arbitration.

Judge Roberts as single arbitrator, New York City for venue, the scope of the arbitration as defined by the agreed upon issues for mediation, the decision of the arbitrator being final and binding upon the parties, the cost sharing, timing  and use of a seasoned mergers and acquisition lawyer (presumably located in New York City) as a "neutral expert to the Arbitrator" are all acceptable. The form of the arbitration award as described in your proposal is acceptable, provided the necessary underlying financial information is disclosed through the

INCLUDING ATTORNEYS FORMERLY OF HUTCHINS WHEELER & DITTMAR

ALBANY, NY • BOSTON, MA • BUFFALO, NY • GARDEN CITY, NY • HARTFORD, CT • MANCHESTER, NH • McLEAN, VA
NEW YORK, NY • ORANGE COUNTY, CA • PROVIDENCE, RI • ROCHESTER, NY • SAN FRANCISCO, CA • WASHINGTON, DC



NIXON PEABODY LLP

Memorandum to Ralph B. Levy
May 27, 2004
Page 2

discovery/arbitration process. Discovery shall be conducted in accordance with the terms of Section 1.3(l) of the share purchase agreement.

The "neutral expert to the Arbitrator" should be selected by the arbitrator from her own list of candidates deemed acceptable by both ChoicePoint and Mr. Alvarez. ChoicePoint should agree now that Mr. Alvarez may be represented by Nixon Peabody, LLP, including Deborah Thaxter and David Gluck. The decision and award of the arbitrator should be enforceable in any court of competent jurisdiction.

With agreement upon the issues (to be evidenced in writing), the scope of the mediation/arbitration shall be so limited. Procedurally, the matter should be submitted to arbitration at the time the mediation is commenced, pending the outcome of the mediation. If the parties cannot agree upon the open issues and commence the mediation/arbitration in accordance with your proposal in a timely manner, then we shall submit the matter to arbitration on behalf of Mr. Alvarez pursuant to Section 1.3(l) of the Share Purchase Agreement.

Open Issues to be Mediated/Arbitrated.

Mr. Alvarez considers the following to be the open issues to be mediated/arbitrated.

1. Experian Credit Variables. All sales of Experian Credit Variables by any ChoicePoint affiliate during the Earnout Period should be included in the Earnout calculation of Revenue and OPBA as set forth in the original Earnout calculation provided to him by Mr. de Janes on September 8, 2003 and as confirmed in various correspondence from representatives of ChoicePoint prior to the calculation of the Earnout. Mr. Alvarez takes the position that all sales of Experian Credit Variables were fulfilled "by or through" MITI/DMCD during the Earnout Period, including Experian Credit Variables sold through the Experian Insurance Group during the Earnout Period.

2. Experian Insurance Group. Without double counting Revenue and OPBA credit given to the Earnout for sales of Experian Credit Variables by the Experian Insurance Group, Mr. Alvarez takes the position that all revenues and OPBA from the operations of the Experian Insurance Group should be included in the Earnout calculation.

3. MITI/DMCD Work Sold by Others. Again, without double counting Revenue credit given for sales of Experian Credit Variables, and certain sales of Attract, Attract with Claims, Expiration Date and Field Assist/Print Production included in the Earnout calculation, MITI/DMCD should receive revenue credit for jobs performed at MITI/DMCD and shipped to other divisions or affiliates of ChoicePoint for ultimate sale to customers. (In his December correspondence Doug Curling included $500,000 in revenue to address this issue, but Mr.

NIXON PEABODY LLP

Memorandum to Ralph B. Levy
May 27, 2004
Page 3

Alvarez has not received any background information to support this extimate, and he has no
basis or context to determine if that amount is fair or appropriate.)

4. MITI/DMCD Internal Work. MITI/DMCD should receive revenue credit for work
performed on internal jobs requested by ChoicePoint where there was no subsequent sale of the
MITI/DMCD work product. (This category does not apply with respect to the substantial work
done by MITI/DMCD to maintain, process, enhance and refresh the data used in the DirectLink
data stores, which is covered by issues 1 and 3 above.)

5. All Data Sales of ChoicePoint. MITI/DMCD should receive Revenue and OPBA
credit for all data sales to outside customers made by any division or group within ChoicePoint
and its affiliates under circumstances where the work could have been transferred to
MITI/DMCD on a commercially reasonable basis.

6. Revenue Verification. Mr. Alvarez has repeatedly and consistently requested from
ChoicePoint disclosure regarding sales made by various persons who were part of the
MITI/DMCD organization who do not appear on the sales by salesperson reports that he has
received from ChoicePoint, including Schedule 5A to the report prepared by ChoicePoint's
internal audit group and provided to Mr. Alvarez on November 21, 2003 by Mr. Curling.
Persons that Mr. Alvarez is concerned about include Steven Scruton, William Fayerweather,
Scott Watkins, Roxanne Ferguson (and those persons who reported to her) and Steven Dexter
(and those persons who reported to him). It is for this reason that he has requested a "sales by
salesperson" report for all ChoicePoint sales people with some description of the types of data or
services that they sold.

With respect to each of these items there is information we do not have, that would be
helpful, if not critical, to have prior to the mediation. For instance, (i) does the $1.425 of
Experian Credit Variables sold during the Earnout Period (as reported in the September, 2003
Earnout calculation) include such sales from the Experian Insurance Group (if not, what is the
amount); (ii) what is the total amount of Revenue and OPBA of the Experian Insurance Group
during the Earnout Period; (iii) what is the rationale for the 25% profit margin on Nationwide
sales; (iv) what work was done by MITI/DMCD that was sold by other CP divisions, what was
the revenue from those sales; (v) what was the amount of data sales within CP by units other than
MITI/DMCD (and what were the reasons that such work was not transferred to MITI/DMCD)
and (vi) what are the sales by sales person for all sales people related to MITI/DMCD during the
Earnout Period, and what kind of data/products were they selling. Getting such information in
advance of the mediation would assist to either (i) dispel the issues, or (ii) give Mr. Alvarez
some context to determine the fairness of proposed resolutions during the course of the
mediation.

NIXON PEABODY LLP

Memorandum to Ralph B. Levy
May 27, 2004
Page 4

Stipulated Matters.

The list of contested issues above presumes agreement with respect to other issues based on the correspondence between Mr. Alvarez and Doug Curling in trying to resolve their differences. These stipulated matters include: (i) Revenues and OPBA from Field Assist/Print Production at 30% on sales to Centex, First Union, Wells Fargo and Nationwide are included (assuming Mr. Alvarez is satisfied with the rationale/explanation for the 25% profit margin ascribed to these sales); (ii) that the severance expense paid to Mr. Alvarez is reversed out of the calculation; and (iii) that ChoicePoint is otherwise satisfied to use the numbers as provided to Mr. Alvarez in the prior Earnout calculations. To the extent that there is not agreement on these points, they should be added to the list of open issues to be mediated/arbitrated.

The explanations that you provided regarding the Oracle License, the treatment of depreciation and the additional deferred revenues are acceptable to Mr. Alvarez.

We hope this provides a basis to move forward with the mediation/arbitration process as you have proposed. We look forward to hearing from you.

# MEMORANDUM

TO:     David R. Gluck
        Deborah L. Thaxter

FROM:   Ralph B. Levy
        James N. Gorsline

DATE:   June 25, 2004

RE:     Proposed Mediation/Arbitration Agreement ("MAA")
        between ChoicePoint ("CP") and Mr. Alvarez

---

This memorandum identifies CP's areas of agreement and disagreement with, and request for clarification as to portions of, your memorandum dated May 27, 2004 (the "Alvarez Memo," the text of which is italicized herein). The response to this memorandum should allow the parties promptly to draft and enter into a formal MAA.

Alvarez Memo.

> *The purpose of this memorandum is to respond to your proposal dated April 12, 2004 concerning mediation and arbitration issues. No rights of Mr. Alvarez under the Share Purchase Agreement are hereby waived, and Mr. Alvarez's claims shall not be limited to those issues set forth below in the event we cannot reach timely agreement regarding your proposal.*

CP Response.

CP agrees that neither Mr. Alvarez or CP is waiving any rights under the Share Purchase Agreement (the "SPA") in the event the parties are unable to reach a mutually acceptable MAA.

Alvarez Memo.

> *Mediation.*
> *Mr. Geronemus as mediator, New York City for venue, the timing, duration and cost sharing of the mediation are all acceptable as described in your proposal. The list of issues subject to mediation and the stipulation of other facts concerning the calculation of the Earnout amount are discussed below.*

CP Response.

To avoid misunderstanding, the venue, timing, duration and cost that were described in CP's proposal (with which Mr. Alvarez appears to agree) are:

β

- o   Mediate within two weeks of MAA execution, subject to availability of Mediator.

- o   Costs of mediator to be shared.

- o   Mediation in New York City at specific location to be determined.

- o   Mediation to be one day unless mutually extended.

<u>Alvarez Memo.</u>

> *Mr. Alvarez will be present for the mediation with Mr. Gluck and Ms. Thaxter. Given his extensive discussions with Mr. Alvarez, we think it would make sense to have Doug Curling available to reach any settlement decisions that may be possible.*

<u>CP Response.</u>

CP has no objection to Mr. Alvarez, Mr. Gluck and Ms.Thaxter attending the mediation. CP has not decided who will attend for CP, but except for committing to attendance by one of more persons having corporate authority to settle, that decision must be left to CP's sole discretion.

<u>Alvarez Memo.</u>

> *Arbitration.*
> *Judge Roberts as single arbitrator, New York City for venue, the scope of the arbitration as defined by the agreed upon issues for mediation, the decision of the arbitrator being final and binding upon the parties, the cost sharing, timing and use of a seasoned mergers and acquisition lawyer (presumably located in New York City) as a "neutral expert to the Arbitrator" are all acceptable. The form of the arbitration award as described in your proposal is acceptable, provided the necessary underlying financial information is disclosed through the discovery/arbitration process. Discovery shall be conducted in accordance with the terms of Section 1.3(1) of the share purchase agreement.*

<u>CP Response.</u>

The parties appear to be in agreement:

- o   If mediation fails, binding arbitration to follow.

- o   Arbitral issues to be no broader than issues in mediation.

- o   Judge Kathleen Roberts as arbitrator, with NY M&A lawyer as her neutral expert.

- o   Costs of arbitrator and neutral expert to be shared.

- o   Venue is New York City at specific location to be determined.

- o Arbitration commences within 60 days of conclusion of mediation, subject to availability of arbitrator and neutral expert schedules.

- o Arbitration award to include revenue and OPBA figures for each issue (unless issue involves OPBA only) and Earnout calculation.

- o Arbitration is final and binding within meaning of FAA.

- o Pre-arbitration hearing discovery in accordance with the rules of the FRCP, either party having the right to ask the arbitrator to set reasonable limits. (We prefer this text to a reference to Section 1.3(1) of the SPA since the MAA will moot the difference between us whether that section of the SPA is applicable in any event.)

However, CP does not understand the "proviso" in the next to last sentence and asks that it be removed as being inconsistent with the agreement that pre-hearing discovery will be permitted and that an arbitration award will be final and binding.

Alvarez Memo.

> *The "neutral expert to the Arbitrator" should be selected by the arbitrator from her own list of candidates deemed acceptable by both ChoicePoint and Mr. Alvarez. ChoicePoint should agree now that Mr. Alvarez may be represented by Nixon Peabody, LLP, including Deborah Thaxter and David Gluck. The decision and award of the arbitrator should be enforceable in any court of competent jurisdiction.*

CP Response.

CP has no objection to the first and last sentences. However, Nixon Peabody needs to decide in advance whether any lawyer who participated as counsel in negotiating or closing the SPA, or in its Earnout discussion aftermath, will be a witness for Mr. Alvarez. Any such lawyer cannot be both a witness and an advocate in the arbitration. Subject to that concern, CP is agreeable to allowing Nixon Peabody and its client to make their own election, which should be memorialized in the MAA or in a written side letter between counsel.

Alvarez Memo.

> *With agreement upon the issues (to be evidenced in writing), the scope of the mediation/arbitration shall be so limited. Procedurally, the matter should be submitted to arbitration at the time the mediation is commenced, pending the outcome of the mediation. If the parties cannot agree upon the open issues and commence the mediation/arbitration in accordance with your proposal in a timely manner, then we shall submit the matter to arbitration on behalf of Mr. Alvarez pursuant to Section 1.3(1) of the Share Purchase Agreement.*

CP Response.

CP has no objection to the first sentence, nor does CP have any objection to making an

3

"arbitration submission" when the mediation is commenced, so long as the arbitration process (including discovery) does not commence until after a failed mediation.

The last sentence is a mere statement of what Mr. Alvarez believes his rights may be if the parties fail to agree on a MAA. For the record, CP disagrees that Mr. Alvarez would be entitled to proceed under Section 1.3(l) of the SPA. However, this latent disagreement will be mooted by a MAA that supersedes the SPA with respect to the Earnout.

Alvarez Memo.

    *Open Issues to be Mediated/Arbitrated.*

    *Mr. Alvarez considers the following to be the open issues to be mediated/arbitrated.*

    *1.    Experian Credit Variables. All sales of Experian Credit Variables by any ChoicePoint affiliate during the Earnout Period should be included in the Earnout calculation of Revenue and OPBA as set forth in the original Earnout calculation provided to him by Mr. de Janes on September 8, 2003 and as confirmed in various correspondence from representatives of ChoicePoint prior to the calculation of the Earnout. Mr. Alvarez takes the position that all sales of Experian Credit Variables were fulfilled "by or through" MITI/DMCD during the Earnout Period, including Experian Credit Variables sold through the Experian Insurance Group during the Earnout Period.*

    *2.    Experian Insurance Group. Without double counting Revenue and OPBA credit given to the Earnout for sales of Experian Credit Variables by the Experian Insurance Group, Mr. Alvarez takes the position that all revenues and OPBA from the operations of the Experian Insurance Group should be included in the Earnout calculation.*

    *3.    MITI/DMCD Work Sold by Others. Again, without double counting Revenue credit given for sales of Experian Credit Variables, and certain sales of Attract, Attract with Claims, Expiration Date and Field Assist/Print Production included in the Earnout calculation, MITI/DMCD should receive revenue credit for jobs performed at MITI/DMCD and shipped to other divisions or affiliates of ChoicePoint for ultimate sale to customers. (In his December correspondence Doug Curling included $500,000 in revenue to address this issue, but Mr. Alvarez has not received any background information to support this estimate, and he has no basis or context to determine if that amount is fair or appropriate.)*

    *4.    MITI/DMCD Internal Work. MITI/DMCD should receive revenue credit for work performed on internal jobs requested by ChoicePoint where there was no subsequent sale of the MITI/DMCD work product. (This category does not apply with respect to the substantial work done by MITI/DMCD to maintain, process, enhance and refresh the data used in the DirectLink data stores, which is covered by issues 1 and 3 above.)*

    *5.    All Data Sales of ChoicePoint. MITI/DMCD should receive Revenue and OPBA credit for all data sales to outside customers made by any division or group within*

*ChoicePoint and its affiliates under circumstances where the work could have been transferred to MITI/DMCD on a commercially reasonable basis.*

CP Response:

 CP respectfully requests that Mr. Alvarez re-word paragraphs 1-5 so that they are put as short questions presented, that CP can review for insertion into a MAA, rather than as argumentative statements of position, with which CP cannot agree.

 CP also has questions for the MAA, some of which may be unnecessary for separate statement if they are subsumed by Mr. Alvarez's questions:

- The Nationwide Question: "What were the Earnout Period revenues and related operating profit margins with respect to Field Assist and Print Production for Nationwide?"

- The Severance Expense Question: "Should the expenses associated with Mr. Alvarez's severance be included in the OPBA that is used in the Earnout calculation?"

- The Nameseeker Question: "Should sales of Experian Credit Variable data to Nameseeker be included in the Earnout calculation?"

Alvarez Memo.

 *6. Revenue Verification. Mr. Alvarez has repeatedly and consistently requested from ChoicePoint disclosure regarding sales made by various persons who were part of the MITI/DMCD organization who do not appear on the sales by salesperson reports that he has received from ChoicePoint, including Schedule 5A to the report prepared by ChoicePoint's internal audit group and provided to Mr. Alvarez on November 21, 2003 by Mr. Curling. Persons that Mr. Alvarez is concerned about include Steven Scruton, William Fayerweather, Scott Watkins, Roxanne Ferguson (and those persons who reported to her) and Steven Dexter (and those persons who reported to him). It is for this reason that he has requested a "sales by salesperson" report for all ChoicePoint sales people with some description of the types of data or services that they sold.*

CP Response.

 Paragraph 6 does not state a question for mediation or arbitration. Rather, reflects a concern about "numbers verification." CP understands it must address this concern if mediation is to be successful. CP also understands this concern will form a basis for arbitration discovery if mediation fails. But CP does not agree that "revenue verification" should be addressed in the MAA otherwise than as previously discussed.

*Alvarez Memo.*

With respect to each of these items there is information we do not have, that would be helpful, if not critical, to have prior to the mediation.

For instance, (i) does the $1.425 of Experian Credit Variables sold during the Earnout Period (as reported in the September, 2003 Earnout calculation) include such sales from the Experian Insurance Group (if not, what is the amount);

> CP Response: The answer is no. The $1,425,341 shown on Exhibit 3C of the November 21 Calculation does not include EIV-related sales[1]. CP is preparing and will deliver to Mr. Alvarez in advance of any mediation a schedule (the "EIV Schedule") that will show EIV activity during the Earnout Period.

(ii) what is the total amount of Revenue and OPBA of the Experian Insurance Group during the Earnout Period;

> CP Response: $0 and $0, respectively, since you have used defined terms from the SPA and it is CP's position that the Earnout calculation does not include EIV-related sales. (See reference above to preparation of an EIV Schedule.)

(iii) what is the rationale for the 25% profit margin on Nationwide sales;

> CP Response: 25% was a good faith estimate. Since then, CP has worked to quantify the margin with greater precision. As a result, it appears that operating profit percentage for the Field Assist and Print Production activities of CP for Nationwide is 32.77%, rather than 25%. However, in performing this additional analysis, CP has determined that the Earnout Period revenue is $812,148 (30% of $2,707,161) instead of the $1,305,167 (30% of $4,350,557), and the OPBA is $266,105 (30% of $887,016) instead of $326,292 (30% of $1,087,640). Schedules of the foregoing will be provided prior to mediation. (The decrease in revenue is due to the fact that the original amount mistakenly included Nationwide revenues for items other than Field Assist and Print Production activities.)

(iv) what work was done by MITI/DMCD that was sold by other CP divisions, what was the revenue from those sales;

> CP Response: CP is confused by this question. It suggests that MITI/DMCD fulfilled orders yet CP divisions (other than the Precision Marketing group) enjoyed the related sales. If that is the question, the answer is none. If that is not the question, please rephrase it for CP.

---

[1] CP uses the terms "Experian Insurance Vertical" or "EIV" to refer to the business and customers that CP acquired in a transaction dated as of January 1, 2002, wherein CP paid $15 million to Experian Marketing Solutions, Inc. CP assumes that Mr. Alvarez refers to this transaction when he refers to the "Experian Insurance Group."

(v) what was the amount of data sales within CP by units other than MITI/DMCD (and what were the reasons that such work was not transferred to MITI/DMCD) and

CP Response: CP is also confused by question. It suggests that CP sold data internally, between divisions. Also, the data to which the question refers is undefined. CP invites you to clarify the information you are seeking.

(vi) what are the sales by sales person for all sales people related to MITI/DMCD during the Earnout Period, and what kind of data/products were they selling.

Getting such information in advance of the mediation would assist to either (i) dispel the issues, or (ii) give Mr. Alvarez some context to determine the fairness of proposed resolutions during the course of the mediation.

CP Response: This information was previously provided (in Schedule 5A of the November 21 submission), although CP believes that Mr. Alvarez may not have understood everything that Schedule 5A included. For further explanation:

- Steve Scruton was a VP of Sales. The sales he made directly are included in the "House" column on Schedule 5A. "House" is not a person – it is the name assigned to sales that are not attributable to a particular sales representative and, more specifically, to sales made by CP's sales managers and VP of sales.

- William Fayerweather is not a sales representative. He is a database product expert who sometimes provided technical assistance to a sales representative. In 2002, he split a couple of small commissions with Sales Representative Dale Halon. Mr. Fayerweather's share is included in the column captioned "Halon" on Schedule 5A; to separately include him would be double counting.

- Scott Watkins was a manager over a couple of "large" accounts (Wells Fargo, Nationwide, Centex and Wachovia). His sales, and the sales of the staff who report to him, are reported in the Schedule 5A column captioned "No Rep Assigned."

- Roxanne Ferguson is a sales manager. She reports to Steve Scruton (VP of Sales) and manages sales representatives who report to her, although she still continues to generate some sales herself. Since she is a sales manger (as opposed to a sales representative), her individual sales are, like Steve Scruton's, included in the "House" column. The sales made by the sales representatives who report to her are shown on Schedule 5A in the columns captioned "[Dale] Halon," "[Curt] Mellott," "[Linda] Sullivan," "[Lee] Thompson," and "[Peggy] Van Kirk."

- Steven Dexter was a manager of sales. The sales he made directly are, like Steve Scruton and Roxanne Ferguson, included in the "House" column.

The people who report to Mr. Dexter are respectively shown on Schedule 5A in the columns "[Danielle] Brooks," "[John] Markos," "[Bob] McCarron," "[Pete] McLean," "[Scott] Paulus," "[Craig] Peterson," "[Michael] Pooley," "[Jeff] Soltesz" [who replaced Danielle Brooks], "[Jeff] Warnock," and "[Jeanine] Riordan."

- Note also that the sales total on Schedule 5A ($30.341 million) matches the revenue total shown on Schedule 2A.

Alvarez Memo.

*Stipulated Matters.*
*The list of contested issues above presumes agreement with respect to other issues based on the correspondence between Mr. Alvarez and Doug Curling in trying to resolve their differences. These stipulated matters include: (i) Revenues and OPBA from Field Assist/Print Production at 30% on sales to Centex, First Union, Wells Fargo and Nationwide are included (assuming Mr. Alvarez is satisfied with the rationale/explanation for the 25% profit margin ascribed to these sales); (ii) that the severance expense paid to Mr. Alvarez is reversed out of the calculation; and (iii) that ChoicePoint is otherwise satisfied to use the numbers as provided to Mr. Alvarez in the prior Earnout calculations. To the extent that there is not agreement on these points, they should be added to the list of open issues to be mediated/arbitrated.*

CP Response.

CP does not agree to the suggested stipulations. They should not be included in the MAA.

*Alvarez Memo.*

*The explanations that you provided regarding the Oracle License, the treatment of depreciation and the additional deferred revenues are acceptable to Mr. Alvarez.*

CP Response.

Noted, with appreciation.

To avoid any dispute over which document controls, the MAA should explicitly provide that it supercedes all SPA dispute resolution provisions relative to the Earnout.

We believe the parties should be able to draft the formal MAA very promptly after we discuss this response to the Alvarez Memo.

8